RALPH ELSMAN, Plaintiff, *v.* GLENS FALLS INDEMNITY COMPANY, Defendant.

Supreme Court, Bronx County, February 27, 1933.

*Edward L. Johnson* [*William J. Killea* of counsel], for the plaintiff.

*Carl Rood* and *Alfred C. B. McNevin*, for the defendant.

COLLINS, J.   The plaintiff seeks to recover against the ·defendant-surety on an attachment bond the sum of $50,000 as damages produced by the attachment.   The attachment was released, and the action in which it issued was voluntarily discontinued by the attachment plaintiff.

The plaintiff was sued by his former wife in the State of California for the sum of $276,000 for breach of contract.   Being a non-resident of that State, jurisdiction in that action was acquired over him on May 2, 1931, by attaching real estate in California and 1,332 shares of stock of the Pacific Gas and Electric Company, registered in plaintiff's name, and which had been pledged to the Bank of

America in New York as partial collateral security for a loan, about two years prior to the attachment.

To obtain the attachment the California plaintiff gave an undertaking wherein the defendant herein, as surety, bound itself to pay " all costs that may be awarded to the said defendant Ralph Elsman [plaintiff herein], and all damages which he may sustain by reason of the said attachment," not exceeding the sum of $50,000 and " if the said attachment is discharged on the ground that the said plaintiff was not entitled thereto under section 537 of the Code of Civil Procedure of the State of California, the said plaintiff will pay all damages which the said defendant Ralph Elsman may have sustained by reason of the said attachment, not exceeding the sum specified in this undertaking." The form is similar to that employed in New York.

To defend the California suit, the plaintiff employed California attorneys, as well as attorneys in Nevada and New York, the latter two being expedient because of their familiarity with the facts on which the California action was based. Both the New York and Nevada attorneys visited California in connection with the litigation.

About May 19, 1931, this plaintiff, while in Nevada, with knowledge of the institution of the California action, but — so he claims — without knowledge of the attachment, yet having in mind the avoidance of an attachment, instructed the Bank of America in New York to sell the stock. The bank, through its brokers, attempted to effect a sale. The order therefor was given, but delivery was not achieved because of the attachment.

The plaintiff's attorneys, deeming that any attempt to vacate or dissolve the attachment would be futile, made no effort to discharge the levy. The levy continued until April 16, 1932, when it was released with the consent of the attachment plaintiff. Preparations to defend the case on the merits continued up to the eve of trial, and the plaintiff, his New York counsel and a vice-president of the Bank of America journeyed from New York to California to participate in the trial. Upon their arrival there, about June 16, 1932, they were informed that the action had been voluntarily discontinued by the plaintiff therein the previous day. The present action on the attachment bond for the claimed wrongful levy followed.

On the trial the claim for damages to the real property was abandoned, leaving the damages complained of: (1) To the stock, based upon its market depreciation between the time of the levy and the time of the abortive sale or release, amounting to approximately $23,000; (2) the expenses in connection with the California

litigation, embracing attorneys' fees actually paid, aggregating $10,450, and (3) attorneys' fees incurred but not disbursed, amounting to $16,500; (4) traveling expenses to and from California, amounting to $2,000, and expenditures for transcontinental telephones and telegrams, amounting to $1,000, making a grand total of claimed damages in excess of $50,000.

There is little or no controversy regarding the salient facts. Concededly, the California law governs. The discord concerns the status of that law, and its applicability to the facts.

The defendant insists that no damages have been proved. As to the stock, it contends that the claimed damages are too remote and speculative; that, by its hypothecation, it was placed beyond the plaintiff's power to sell and that, accordingly, the levy could not have prevented a sale by the pledgee bank. Further, that if he desired to sell, the plaintiff, to minimize the damage, should have applied to the court for permission to sell and offered to substitute the proceeds, or, in any event, that he should have sought the consent of the California plaintiff or her surety.

Regarding the attorneys' fees and expenses, the defendant maintains that the California law allows recovery only for such as were actually paid in procuring the discharge of the attachment, and argues that, since no proceedings were taken in that direction, no recovery therefor can be had. More, that counsel fees and other expenses not actually paid, though incurred, are not recoverable.

(1) It was established that the market value of the stock depreciated. For support of his claim to recover for such depreciation, the plaintiff leans heavily upon *McCarthy Company* v. *Boothe* (2 Cal. App. 170; 83 Pac. 175, cited in *Atlas Development Co.* v. *National Surety Co.*, 190 Cal. 329) wherein recovery on an attachment bond for wrongful levy upon stock was measured by the difference between the value of the stock when seized and when restored, with the loss of its use meanwhile.

As to the application of the general rule governing recovery for wrongful attachment, to a levy upon stock, it was there stated: " But, assuming the rules as to personal and as to real property generally to be as above stated, we do not think this contention can be sustained but, rather, we think that there is more reason for the application of the former rule to the case of an attachment of stock than in the case of personal property generally. For stock generally, more than other species of personal property, is bought for sale, and its principal value in general consists in its selling value; and not only is this destroyed by the attachment, but all the profits and dividends to accrue from it are impounded equally with the stock itself. (Code Civ. Proc. § 698.)"

The defendant protests that the *McCarthy* case is not controlling here not only because it is not a holding by the highest court of California, but because it conflicts with the decisions of the highest court. In any event, the defendant says, the facts here are distinguishable from the facts there, in that it was clearly established that the plaintiff in the *McCarthy* case was a regular dealer in stocks and that the stock there " in question was bought for resale, and the plaintiff ' could have sold the same if it could have obtained possession and made delivery and transfer thereof.' " (*McCarthy* v. *Boothe, supra.*)

The determination of the question here presented does not compel either the acceptance or the rejection of the rule announced in the *McCarthy* case.

True, the plaintiff here testified that since 1925 or 1926 he was in the exclusive business of buying and selling securities, and that he purchased the Pacific Gas stock for resale. But I am not persuaded that he was such a dealer in securities as to bring him within the scope and spirit of the *McCarthy* case. The plaintiff acquired the Pacific Gas stock about two years anterior to the levy, and he still possessed it at the time of the trial hereof. It may be that the plaintiff intended to sell it when he deemed that a sufficient profit thereon was obtainable. But this might be said of most people who purchase stocks for investment. That alone would not constitute the purchase one for resale. Certainly, to borrow the language in *Miller* v. *Ferry* (50 Hun, 256), " the decrease in the value of the shares did not result from the attachment * * * but it resulted from a diminution in the market price of the shares themselves. They were in no respect injured or deteriorated by the attachment, but the loss which was suffered arose entirely and wholly out of a distinct and extraneous circumstance, for which the attaching creditors were in no manner responsible; and, for that loss, the sureties, in the undertaking given upon the issuing of the attachment, it has been held, would not be liable," And, as was said in *Atlas Development Co.* v. *National Surety Co. (supra)*: " It is clear at once that such a measure of damages, particularly when not shown to have been within the contemplation of the surety corporation, would be remote, speculative and uncertain."

Whilst it would appear that, pursuant to plaintiff's instructions, the bank undertook to sell the stock, and that delivery thereof was prevented by the attachment, the fact is indisputable that the stock had been attached at least two weeks prior to the instructions and abortive sale. Again, the plaintiff's own testimony indicates that the attempted sale, after he had owned the stock for two years, was not a normal transaction in the regular course of his dealings;

it was largely motivated by, and timed to escape the sweep of, a feared attachment.

Further, I am not convinced that the plaintiff did all he could and should have done to minimize the damage. Section 548 of the California Code of Civil Procedure provides: " Whenever property has been taken by an officer under a writ of attachment and it is made to appear satisfactorily to the court or a judge thereof that the interest of the parties to the action will be subserved by a sale thereof, the court or judge may order such property to be sold in the same manner as the property is sold under an execution, and the proceeds to be deposited in the court to abide the judgment of the action. Such order can be made only (1) after notice to the adverse party or his attorney in case such party has been personally served with a summons in the action, or (2) after an order of service of summons by publication has been made."

Non-perishable property comes within the purview of this section. (*Callahan* v. *Danziger*, 172 Cal. 738; *Witherspoon* v. *Cross*, 135 id. 96.)

The plaintiff did not utilize this machinery. He did not advise the California plaintiff or her surety of his desire or opportunity to sell the stock, nor did he offer to substitute the proceeds of the proposed sale for the stock. He should not be permitted to speculate at the surety's expense.

Irrespective of the provisions of section 548 of the California Code of Civil Procedure, the obligation of the plaintiff was more than one of passivity. The law fastened upon him an affirmative duty. In *Hamilton* v. *McPherson* (28 N. Y. 72, 76) it was succinctly declared: " The law, for wise reasons, imposes upon a party subjected to injury from a breach of contract the active duty of making reasonable exertions to render the injury as light as possible. Public interest and sound morality accord with the law in demanding this; and if the injured party, through negligence or wilfulness, allows the damages to be unnecessarily enhanced, the increased loss justly falls upon him." And in *Worth* v. *Edmonds* (52 Barb. 40, 42) it was cogently observed: " Because one party violates his contract, the other is not at liberty entirely to disregard his own interest, and then seek full indemnity by the recovery of damages against the defaulting party. The law is not so unreasonable or so unjust." Also: *Niagara Falls Paper Co.* v. *Lee* (20 App. Div. 217). The law of California is likewise (*Mabb* v. *Stewart*, 147 Cal. 413; *Sargent* v. *North End Water Co.*, 190 id. 512; *Vitagraph, Inc.*, v. *Liberty Theatres Co.*, 197 id. 694.)

In *Crawford* v. *Staples* (184 Ky. 477), which involved the question of depreciation of wrongfully attached property, it was wisely and

pertinently said: " Even if the soundness of these conclusions were doubtful another potent reason why plaintiff should not be permitted to recover for any loss for a claimed prevention of an advantageous sale he desired to make while the property was under attachment, is the fact that although bound to minimize his losses he did not apprise the court or the plaintiffs of his desire or ability to make the sale until after the attachment was dismissed, which no doubt would have been readily agreed to by the plaintiffs or allowed by the court upon payment into court of the purchase price, and the loss now asserted could have been prevented.

" It would be both a dangerous and unreasonable rule that would allow the owner of attached property, which is ordinarily and presumably held for use and not for sale, to assert a claim for damage from being prevented from making an advantageous or desirable sale of which he did not inform the court or parties to the action until after the attachment was discharged, and to consummate which he made no effort whatever. Such a loss is entirely too remote, improbable and speculative, at least until notice of its possibility is brought within the comprehension of those liable to be charged therewith."

In *Moseley* v. *Fidelity & Deposit Co. of Maryland* (33 Ida. 37; 189 Pac. 862), cited by the plaintiff, it was said: " It has been held that it is incumbent upon the defendant to show that he has made all reasonable efforts by application to the court to vacate the attachment before he is entitled to recover his expenses and attorney fees incurred in defense of the attachment, but where it appears (as in this instance) ' that a motion to vacate would be futile, it cannot be said that the defendant has failed to make every reasonable effort to vacate.' " The same reasoning is applicable to the claimed damage to the stock, viz.: " It is incumbent upon the defendant [in an attachment] to show that he has made all reasonable efforts by application to the court " or to the California plaintiff or her surety for permission to sell. The plaintiff cannot now profit by his quiescency.

Concluding this element of the case, I am not satisfied that the depreciation in value of the stock was a " detriment proximately caused by the " attachment " or which, in the ordinary course of things, would be liable to result therefrom." (*Elder* v. *Kutner*, 97 Cal. 490.) Accordingly, the claim for stock depreciation is disallowed.

(2) The validity of the plaintiff's claim for attorneys' fees and other expenses for defending the entire case, as distinguished from such expenditures as were occasioned by merely vacating or dissolving the attachment, depends upon whether it was necessary to try

the merits in order to effect a disposition of the levy. Causality is the test. Did the attachment produce the expense? Was the loss " consequential," or was it " an actual and direct injury?" (*Ah Thaie* v. *Quan Wan*, 3 Cal. 216; Cal. Code Civ. Proc. § 539.) I think that it was actual and direct, and so hold.

The California court acquired jurisdiction over this plaintiff solely by virtue of the attachment. It is not pretended that the attachment was irregular or invalid or defective. Its regularity and validity and freedom from defect must be presumed. Indeed, the plaintiff was advised by his California attorney that since the California action was for breach of contract, and since the defendant therein was a non-resident, the attachment could not be dissolved or vacated other than by a defense on the merits. In this situation any attempt to vacate or dissolve the attachment by motion would have been more than futile; it would have increased the labor of attorneys and thus enhanced their compensation.

I am satisfied that in those cases relied upon by the defendant as authority for rejecting the plaintiff's right to the attorneys' fees here claimed, the defendants were not non-residents, so that the expense and labor therein entailed did not ensue directly from the attachment. I am convinced that were the California courts now confronted with the literal question here presented, the progressive and liberal tendencies of those courts would dictate the adoption of the sound New York rule, as expressed in the recent case of *Thropp* v. *Erb* (255 N. Y. 75), wherein it was stated: " Upon this appeal the only question presented is whether the legal expenses incurred by the defendant in his successful defense of the action are damages ' sustained by reason of the attachment,' recoverable in an action upon the statutory undertaking to pay such damages. * * *

" In the present case there would have been no ' reasonable chance of success ' if a motion had been made to vacate the warrant. No contention can be seriously raised that this plaintiff could have rid himself of the warrant of attachment except by a trial on the merits. No futile motion to vacate was necessary to complete the chain of causation between the warrant of attachment and the expenses incurred in the successful defense. * * *

" In each case the question of whether the defense on the merits was the result of the warrant of attachment must depend upon the circumstances of that case. Where that is established the expenses of the defense on the merits may be recovered in an action upon the statutory undertaking as damages sustained by reason of the attachment. This court has reached a similar conclusion in actions brought upon injunction bonds and in the present case ' by analogy

of reasoning, cases arising upon undertakings given upon the granting of injunctions are applicable.' (*Tyng* v. *American Surety Co.*, 174 N. Y. 166; *Olsen* v. *United States Fidelity & Guaranty Co.*, *supra*.)

" Here the defendant in the attachment action was a non-resident. Unless he chose to come into the State personally or by general appearance, the courts of this State could acquire no jurisdiction over his person. By attachment proceedings the court could acquire jurisdiction over property within this State.   *   *   *

" The levy in the attachment action was the cause which induced the defendant in that action to appear and defend on the merits, though no summons was served upon him. Since it was the inducing cause of that appearance and defense, the expenses properly incurred in the defense constitute ' damages sustained by reason of the attachment ' within the intent and meaning of the undertaking."

In accord is *Moseley* v. *Fidelity & Deposit Co. of Maryland* (*supra*).

(3) The next concern is with the attorneys' fees incurred but not paid. Are they recoverable as " damages sustained by reason of the attachment?"

For the negative the defendant correctly points to *Elder* v. *Kutner* (*supra*), which concerned form rather than substance, and which relied upon *Wilson* v. *McAvoy* (25 Cal. 169) and *Prader* v. *Grimm* (28 id. 11); *Simpson* v. *United States Fidelity & Guaranty Co.* (15 F. [2d] 389). The *Wilson* decision came in 1864 and the *Prader* case a year later. Both antedated the enactment of the California Civil Code on March 11, 1872, which was patterned after the New York Code.

That the codifiers of the California law recognized that the rule of the *Wilson* case gave " damages " a pinched interpretation, is attested by their adoption of section 3300 of the Civil Code, which provides: " Measure of damages for breach of contract. For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

Of course, this action arises from contract. Since the enactment of section 3300, no California case appears to have decided the precise issue. That the term " detriment " is more elastic and comprehensive than " damages " is self-evident, and that " detriment " includes an unpaid incurred, as well as a paid, item, seems obvious.

To hold that a litigant with the ability to pay a reasonable fee

is entitled to reimbursement, but that one less fortunate may not recover therefor, though obligated and intending to pay, impresses me as a tax upon indigence. Such doctrine would be discriminatory and unequal; it would antagonize that fundamental policy of the law which strives to accord equal redress and protection to all. The fair and just guide is whether the item was directly and immediately produced by the attachment, whether it was *bona fidely* incurred, and its reasonableness. An arbitrary and inflexible disallowance of every unpaid but incurred expense would unreasonably and unjustly curtail the measure of damages. A rule should not be so compressed as to work the extinguishment of its own light.

The doctrine in New York harmonizes with the more liberal policy expressed in section 3300 of the California Code. Thus in *Crounse* v. *Syracuse, C. & N. Y. R. R. Co.* (32 Hun, 497; affd., 97 N. Y. 631) it was appositely said (at pp. 499, 500): " Perhaps in this State this question may not have been distinctly decided, except in the case cited below; but language has been used in two or three instances showing the views of the Court of Appeals. Thus in *Andrews* v. *Glenville W. Company* (*ut supra*, [50 N. Y. 282] at p. 286), it is said that the party ' is entitled to his expenses reasonably *incurred.*' And again, at page 287: ' Expenses properly *incurred* on the part of the defendant for the purpose of dissolving an injunction were legally allowable as *damages.*' Again, in *Hovey* v. *Rubber Tip Pencil Company* (*ut supra*, [50 N. Y. 335] at p. 337): ' A party is entitled to damages not only for all expenses which he has *incurred* for fees and for legal services in removing the temporary injunction,' etc. So in *Packer* v. *Nevin* (67 N. Y. 550, at page 533) there is a remark to a similar effect showing that a *charge incurred*, as well as a fee paid, should be allowed. To *incur* is to *become liable to*, not necessarily to have paid. The case of *Wilde* v. *Joel* (15 How. Pr. 320), in General Term, Superior Court, sustained the defendant's views. See, also, to the same point, *Noble* v. *Arnold* (23 Ohio, 264); High on Injunctions, § 1688; *Underhill* v. *Spencer* (25 Kan. 71). Of course the distinction is familiar between a mere indemnity against damages and an indemnity against liability. (See *National Bank* v. *Bigler*, 83 N. Y. 51.) But probably the cases in regard to indemnities, strictly so called, are hardly applicable. The parties to the undertaking, by its terms, do not agree to indemnify, but to pay such damages as the defendant may sustain. Nor is the undertaking given to protect the defendant against the acts of some third person, or against some consequence of the defendant's own acts; as is often the case in bonds of indemnity. The undertaking is to protect the defendant against acts of the plaintiff which may prove to have been unjustifiable. There is every reason, therefore,

for giving a construction to the undertaking which shall protect the defendant against damages *incurred*, if caused by the plaintiff's unjustifiable act. The defendant should be made *secure*, and should not merely be indemnified. This seems to us the just construction to be put upon this contract, considering its language and its purpose."

The *Crounse* doctrine finds reaffirmation in *Thropp* v. *Erb* (*supra*), which significantly employs the term "incurred." In accord are *McFarland* v. *Ratcliffe* (167 Wash. 673; 9 Pac. [2d] 1090) and *Moseley* v. *Fidelity & Deposit Co. of Maryland* (*supra*). Also illuminating are *Nelson* v. *Kellogg* (162 Cal. 622); *Donnelly* v. *Hufschmidt* (79 id. 74); *McLaughlin* v. *San Francisco, etc., Co.* (113 id. 590).

The court is not bound by the fees actually paid or by those incurred but not paid. These amounts may be some evidence or indication of reasonableness, but the court must determine the real worth of the services as revealed by the evidence. The claim here is that the plaintiff has actually paid $10,450 to his attorneys and has incurred, but not paid, an additional $16,500, making a total of $26,950. Whilst the amount involved in the California action was $276,000 and the issues important, it seems to me that fees of $26,950 are excessive. Considering that the action was not tried, that no intermediate motions were made, that the attachment was voluntarily released and the action discontinued, that two of the attorneys were non-residents of the forum wherein the action was pending, and according due weight to the value of the services which the record discloses were performed, a fee of $15,450 therefor is hereby awarded as fair and reasonable.

(4) Finally, the evidence pertaining to the item of $2,000 for expenses of plaintiff and his witnesses to San Francisco and return to attend the trial, and $1,000 for transcontinental telephones and telegrams, is not clear or satisfactory. These expenditures impress me as excessive. I fix the reasonable expenses covering the two items at $1,250, which, added to the $15,450, makes a grand total of $16,700. Verdict directed for plaintiff for $16,700, with interest together with costs and disbursements. Exceptions to defendant. Thirty days' stay; sixty days to make case.